Andrew McClain, J.,
delivered the opinion of the court.
In this cause there was a demurrer to the hill which was overruled, and the defendants have appealed from that decree to this Court.
In the bill it is- charged that complainant, in 1864, through his agents in Memphis, Tennessee, shipped to defendants, at New York, 164 bales of cotton to be sold, and the proceeds held subject to complainant’s order. Defendants are styled in the bill Cotton Factors and Commission Merchants of the cotton.
It is charged that defendants sold the cotton and rendered an account of sales.
It is also charged that thereafter, viz: on the 8th of June, 1864, the proceeds of sale . being still in the hands of defendants, complainant, through his agents at Memphis, instructed defendants to make a purchase of $20,000 in gold and send the same to the Bank of Montreal, in Canada, and take a certificate of deposit therefor in the name of complainant and his wife.
That two days after this, complainant, through same agents at Memphis, ordered defendants to make an additional purchase of $10,000 in gold, and to make the same disposition of this amount, and take a certificate of deposit in the name of complainant. It is further charged, that at the time of these orders gold was worth, in the market, from $1.85 to $1.90; that on or about *404 the last of June, 1864, the defendants, in response to these orders, wrote complainant’s agents, at Memphis, that they had not bought the gold, being short of funds, but that they would do so on the morrow, and quoting gold at $2.30, and that on ■— July following, complainant went to New York, and finding that defendants had failed to make the purchase as ordered and requested, bought the gold himself, which defendants had been ordered to buy, paying therefor $2.50, and made a deposit of the same in the Bank of Montreal.
It is not charged in the bill directly, that defendants received United States Treasury notes for the cotton, or that reference is made to that kind of currency, when it is alleged that gold was bought by complainant at $2.50, and when quotations are mentioned at $1.85 or $1.90 and $2.30, but it is not controverted in argument that that is the currency meant, and, perhaps, that is the legitimate deduction to be made from the charges of the bill.
It is also charged in the bill that defendants having the funds of the complainant in their hands, wrongfully converted them to their own use, giving as a reason, about the last of June, 1864, why they had not bought the gold, that they were short of funds.
Complainant charges that, in consequence of defendants’ failing to make the purchases as ordered, he has been damaged sixty per cent, on the $30,000, making $18,000, and this suit is brought to recover that amount. The causes of demurrer assigned, are—
1. No contract is shown by which defendants were *405 bound to invest any money in their hands in the manner indicated.
2. No damage could arise from the alleged transaction.
3. The receipt of the funds in full that were in the hands of defendants being admitted, this is a discharge of all claims for damages.
4. It is not shown that defendants were brokers or dealers in gold, or had dealings with Montreal.
5. Ho damages can arise out of a contract to buy gold, as it is not worth more than par in legal contemplation.
6. The alleged transaction was illegal.
The first ground assumed, is, that no contract is shown by which defendants were bound to invest any money in their hands in the manner indicated.
The defendants are styled in the bill, “cotton factors and commission merchants of the cotton.” The terms “factor” and “commission merchant,” in this country, mean the same thing: 1 Bou. Die., 570. As described in the bill, defendants are not general agents, in the extended sense in which factors and commission merchants are understood to be, but their agency is limited to cotton. If it could be said that the purchase of gold falls within the ordinary course of their agency as cotton factors, it surely cannot be maintained that the transmission of gold to a foreign government, and taking certificate of deposit, is within the scope of such agency. Whatever liability, then, attaches to defendants in consequence of their failure to make the purchase, and transmit and take certificate of deposit, as ordered, must arise from the ob *406 ligations of their special contract, outside the ordinary scope of their agency as cotton factors.
It is charged, as we have stated, that complainant, through his agents at Memphis, about the 8th of June, 1864, ordered defendants to make investment. in gold, and transmit to the Bank of Montreal, Canada, and take certificate of deposit. We think no obligation rested upon defendants to obey this order until they agreed to do so.
Although they had converted complainant’s funds to their own use, according to the charges of the bill, still the measure of complainant’s damages, if he had sued before this contract of defendants was entered into, would have been the value of the money, with interest. But when the defendants resjoonded that they had not made the purchase, as ordered, but would do so on the morrow, they assumed an obligation, not only to purchase the gold, as ordered, but also to transmit it to the Bank of Montreal, Canada, and take certificate of deposit. Considering the distance between complainants and defendants, with the surrounding circumstances, we think that this is the legitimate construction to be placed upon this response, and that the parties so understood it.
Now, the obligations which arise from this undertaking must control the present case. It therefore becomes necessary to a correct determination of the questions involved, rightly to understand the character and extent of these obligations.
We do not perceive that it affects the result in the least, whether the charges in the bill be construed to mean that defendants converted all complainant’s funds in their hands before they agreed to purchase the gold. *407 or only a portion of thorn, so as to leave an amount insufficient to make the purchase ordered.
To meet the different aspects in this respect in -which the hill may be viewed, we will first proceed, for convenience of illustration, upon the assumption that all these funds remained in defendant’s hands at the time they agreed to purchase the gold. The application of the result at which we shall arrive, will enable us readily to determine the question of defendant’s liability, upon the assumption that all, or a portion only, of these funds were converted before they agreed to purchase the gold. If these funds had all remained in defendants’ hands at the time they undertook to purchase gold, they would have been at that time, the bailees of complainant, as to these funds.
The distinction between deposit and mandate is this: In the case of deposit, the principal object of the parties is the custody of the thing, and the service and labor are merely accessorial. In the case of a mandate, the labor and services are the principal objects of the parties, and the thing is merely accessorial.
With respect to the cotton, defendants were bailees for hire. But having sold the cotton and got the proceeds into their hands, although they were entitled to retain their commissions out of the funds, they nevertheless, by virtue of the said contract, would become the mandatories of complainant as to these funds, in case there were no consideration, express or implied, for the services agreed upon.
A mandate is a bailment of goods without reward, to *408 be carried from place to place, or to have some act performed about them: Story on Bail., sec. 137.
Now, in the present case, if the bailment supposed, had been one without reward, would an action have lain for failing to comply with the undertaking to purchase the gold, etc.?
The rule, though laid down otherwise by Sir William Jones in his Essay on Bailments, may be now considered settled, that in case of mandate no action will lie for non-feasance.
But, according to all the authorities, an action will lie for misfeasance. If the mandatory Wholly fail or refuse to enter upon the performance of the trust, this is non-feasance, and no action will lie for a breach of the undertaking. But if he actually commence the performance of the trust, and the mandator sustains injury, (through his omission or negligence,) this is misfeasance, and an action will lie.
But though this rule is well established, the just application of the doctrine, as Judge Story remarks, may become a matter of very serious importance. The ground of the doctrine in cases of non-feasance, is, that there is no consideration, and the rule is, ex nudo pacto non oritur actio.
But the same author proceeds to remark: “This rule is inapplicable where the mandate has been fully executed on' the part of the mandator, as if he has delivered the thing which is the subject of the mandate to the mandatory; for in such case there arises from such a delivery and receipt, a sufficient consideration to sup *409 port tbe contract and to found an action for any negligence or omission in the due execution of the mandate. It is not necessary to constitute a sufficient consideration to support the contract, that the bailee should derive some benefit from it. It will be sufficient if the bailor, on the faith of the promise, parts with some present right, or delays the present use of some right, or suffers some immediate prejudice or detriment, or does some act at the bailee’s request:” Story on Bail., 171 a.
In the civil law, the contract of mandate might intervene, although there was no delivery of property by the mandator.
The rule that no action lies for non-feasance, is, so far as we have examined the adjudged cases, limited to mandates of that character: Story on Bail., sec. 142; Thorne v. Leas, 4 Johns., 96.
We have thought proper to trace this contract to its legitimate result, upon the assumption that it was a gratuitous undertaking. But we think it is by no means clear that such is its real character.
Story, in his work on Bailment, says, (sec. 153): “If any compensation is to be paid, it passes into another contract; that is to say, the contract of hire. And it matters not in this particular, whether the compensation is express or implied — whether it is certain or uncertain in amount.”
Chitty says: “The assent of a party to an agreement, in other words, his promise, is either express or implied.”
“Express contracts,” says Blackstone, “are where the terms of the agreement are openly uttered and avowed at the time of the making, as to deliver an ox or ten *410 loads of timber, or to pay a stated price for certain goods. Implied, are such as reason and justice dictate, and which, therefore, the law presumes that every man undertakes to perform. As if I employ a person to do any particular business for me, or perform any work, the law implies that I undertook or contracted to pay him as much as his labor deserves:” Chitty on Cont., page 18.
So in tbe present case, if a promise on tire part of the complainant, to pay for the services which defendants undertook to perform, is to be implied, as we think it is, this promise is a sufficient consideration for the promise of defendants; and supposing the funds to be still in the hands of defendants at the time of this promise, the bailment would have been a bailment for hire and not a mandate.
In the case of a bailment for hire, there is no conflict in the authorities as to the liability of the bailee for breach of the contract.
So, upon the assumption that complainant’s funds were in the hands of defendants at the time of their promise, we have seen that defendants would have been liable, whether their promise and undertaking be construed to be gratuitous or for a reward. This being so, can the defendants be heard to insist on a more favorable rule, when they had converted all or a portion of complainant’s funds to their own use before they entered into this contract? The bare statement of this question suggests the answer. It surely cannot be tolerated, that a rule more favorable for defendants should be applied upon such a state of facts.
*411 A case bearing a nearer analogy to the present case than any other adjudged case of -which we are apprised, is the case of Short vs. Skipwith, 6 Brockenborough R, 103. In that case, the principal, residing in Europe, directed his agent, residing in Virginia, to invest his funds in the hands of the agent in military certificates, which the agent promised to do. But instead of making the investment as directed, he turned over a portion of the funds to another person, who agreed to act as agent, and he retained the balance of the funds in his own hands.
The agent to whom a portion of the funds had been transferred, made the investment in certificates according to the wishes of the owner of the fund. Certificates rose in value, and the first agent who had retained a portion of the funds iu his hands, was held liable for the increased value of so many certificates as might have been bought with the funds retained by him, (at the price certificates were bearing,) at the time the certificates were bought by the other agent.
“In that case,” Justice Marshall said, “suppose a contract for the purchase of an increasing property of any description which contract depended on the payment of money on a given day.
“If the agent in whose hands the purchase money was placed, should, instead of executing his trust, convert a part of the money to his own use, and thereby defeat the contract, it would seem unjust that the remedy of his principal should be limited to the money and interest.
“That this would not necessarily be the measure of damages, is to be inferred from the circumstance that the injured person is not confined to an action for money had *412 and received to his use, but may maintain a special action on the case for the damages actually sustained.”
But the case at bar involves the question: To what time subsequent to the breach is the complainant limited in his demand for damages?
May he stand by for an indefinite time, and after the market price has reached its maximum, then assert his claim for damages, and insist upon the difference between the price at the breach and this maximum as the measure of his damages.
When the article is bought and the time of delivery 'fixed by the contract, and afterwards the article rises in value, the rule is well settled that the difference between the stipulated price and the price at the time agreed upon for delivery, is the measure of damages. And when the article is bought at p, stipulated price, and no time fixed for delivery, then the article is deliverable in a reasonable time, which must depend upon the circumstances of each case and the difference between the stipulated price and the price at the time the article is deliverable, is the measure of damages: 1 Brockenborough, R, 218. Note at the end of the case of Letcher & Arnold vs. Woodson.
Now, if defendants in this case, had bought the gold according to contract, and had refused to deliver it, they surely could not be heard to insist upon a more favorable rule than would have applied if having gold of their own they had sold it to complainant; but no time of delivery being fixed they afterwards refused to deliver it. In that case, as we have seen, the gold should have been deliverable in a reasonable time.
*413 But defendants baying failed to make the purchase, are not entitled to the application of a more favorable rule than if they had made the purchase and had then refused to deliver it.
Now, it is charged in the bill that defendants, about the last of June, 1864, wrote to complainant’s agents at Memphis, that they had not bought the gold, being short of funds, but that they would do so on the morrow, and quoting gold at that time, at $2.30. This must be held to be the date of defendants’ undertaking to purchase the gold. It is further charged, that in July following, (the precise day not stated,) complainant went to New York, and, finding that defendants had not bought the gold, that he then bought the gold himself at $2.50.
Now, here is a time stated that elapsed from the date of the undertaking till the purchase was made, thát can not exceed a month and a few days, (at most,) and may have been only a few days.
Considering the facts and attending circumstances of this case, wTe do not think the time which elapsed from the date of this undertaking till complainant purchased the gold, to have been an unreasonable period, even placing such construction upon the language of the bill as to make it include the longest period which the language used can be made to embrace.
But it is insisted that there can be no damages in this case, for the reason that gold is itself a standard of value, always at par, with itself, and assuming, as we understand, the argument that the funds received by defendants, for complainant’s cotton, were legal tender United *414 States Treasury notes, it is insisted that this kind of money, in legal contemplation, is always at par with gold, and hence no damage could arise in consequence of the failure of defendants to invest complainant’s money in gold. It is not charged in the bill what kind of money defendants received for the cotton, but it is charged that defendants had, in their hands, complainants Money. Now, money is that kind of currency which is a legal tender in payment of debts, or which is convertible at par into legal tender currency: 5 Hum., 15.
Assuming, then, that defendants received for complainant’s cotton that kind of currency which answers this definition of money, it will not follow that complainant sustained no injury from the failure on' the part of defendants to make investment in gold.
A dollar in gold, it is true, is worth no more and no less than a dollar in silver, or a United States legal tender Treasury note of the denomination of one dollar, in payment of debts; and yet, as articles of commerce, their respective values may be widely different.
But one of the causes of demurrer assigned, is, that the alleged transaction is illegal.
The illegality insisted on, as we understand from the argument, is, that the defendants were ordered to make the purchase of gold with legal tender United States Treasury notes, it being assumed that this is the kind of currency received in payment for the cotton. Proceeding upon this assumption, it does not follow, we think, that the transaction is, therefore, illegal.
Gold and silver currency have always constituted articles of commerce, and have been bought the one with *415 the other. The bonds of the Government are bought and sold in the market. It is difficult to perceive any sound reason why legal tender United States Treasury notes may not also be lawfully made the subject of trade and commerce, and bought with gold or silver, or why gold or silver may not be bought with them.
Now, defendants were under no obligation to obey complainant’s order to invest in gold and transmit the same to Montreal, Canada, and take certificate of deposit, until they agreed to do so. But after they had agreed to do so, they were responsible for damages resulting from their failure to comply with their undertaking; and it will be proper to ascertain the amount of damages in that kind of (legal tender) currency, which is least valuable in the market, and to render the decree for that amount; for the defendants, having the privilege of discharging the decree with that kind of currency, it is to be presumed they will do so.
Another cause of demurrer assigned, is, “that complainant received from defendants the amount of proceeds of sale of the cotton, and thereby waived all claims for damages arising from their failure to make the purchase of gold.
It is sufficient to say that it ■ is no where alleged that they have received all their funds in defendants hands, but if it were so alleged, the purport of the charges of the bill repels the conclusion that they intended to release their claim for damages.
"What we have said in considering the other causes of demurrer assigned, dispenses with the necessity of making particular comment upon the only remaining one, viz: *416 that defendants are not charged to have been brokers, having transactions and dealings with Montreal. They must abide their contract.
The decree of the Chancellor overruling the demurrer will be affirmed, and the cause remanded to be further proceeded in according to the ruling herein indicated.